UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

BRIAN RENAUD,
    Plaintiff

v.                                          C.A. No. 14-483-M

CAROLYN W. COLVIN, Acting
    Commissioner of Social Security
    Defendant

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., United States District Judge.

This matter is before the Court on Mr. Renaud's Motion for Reversal (ECF No. 6) of the decision of an Administrative Law Judge (ALJ) affirming the denial of supplemental security income (SSI) benefits to him on his claim of total disability. The Commissioner has filed a Motion to Affirm. (ECF No. 7). For the reasons stated below, the Court remands the case for reconsideration by the ALJ.

### I.

### Procedural History

Brian K. Renaud filed an application for supplemental security income (SSI) on June 19, 2012. (Tr. 48). He alleged a disability, due to a number of impairments, beginning June 6, 2012. *Id.* Mr. Renaud's original claim cited only physical impairments, but on reconsideration he added anxiety disorder as well as sleep apnea. (Tr. 48, 72). His claim was initially denied, denied on reconsideration, and denied after an evidentiary hearing held by ALJ Hugh S. Atkins on July 18, 2013. Mr. Renaud testified at that hearing, as did vocational experts Stephen Kaplan

and Paul Murgo. On August 1, 2013, the ALJ granted the Commissioner's Motion to Affirm and denied Mr. Renaud's Motion for Reversal, finding that he was not under a disability during the relevant time period because he had the residual functional capacity (RFC) to perform his former work as a customer service representative. (Tr. 21). Most significant to this decision, the ALJ also found that Mr. Renaud did not suffer from a severe anxiety impairment. (Tr. 15).

## II.

## Background

Mr. Renaud at the time of the hearing was a 48-year-old man living with a disabled partner. (Tr. 35, 36). Armed with a GED, Mr. Renaud had worked consistently, most recently employed for two years by a temporary agency that deployed him to a call-in center for CVS Caremark, where he spoke to customers and investigated and verified insurance information. (Tr. 31, 32). Before that, he had worked as a maintenance worker at a nursing home, as the parts manager of a repair shop, in a warehouse, in retail for eight years, and as a "rides supervisor" at Rocky Point Amusement Park. (Tr. 33, 34, 180). His earnings record dated back to 1980, and was sufficient to permit him to remain insured through December 31, 2017. (Tr. 13).

## III.

## Central Issue

Mr. Renaud premised his claim for disability on myriad conditions, specifically: coronary heart disease, which had required triple bypass surgery in 2012 as well as the subsequent placing of stents (Tr. 530), sleep apnea, diabetes mellitus with neuropathy, and anxiety manifested by frequent panic attacks of significant duration. The ALJ agreed that the heart disease, the sleep apnea, and the diabetes were all severe impairments, "because they cause more than a minimal limitation on the claimant's ability to perform basic work activities ...[,] are

2

demonstrated by medically acceptable clinical and laboratory diagnostic techniques, and have lasted or are expected to last at least 12 months." (Tr. 15).[1]

The core of this Motion to Reverse is Mr. Renaud's complaint that the ALJ failed to find his anxiety disorder severe.[2] For the reasons outlined below, this Court agrees that the ALJ's finding was not supported by substantial evidence, that the ALJ failed to justify the little weight given to opinions of both treating and consultative experts, and that the ALJ did not sufficiently

---

[1] Mr. Renaud also presented evidence of hypertension, hyperlipidemia and HIV. The ALJ found these were all non-severe because they did not cause more than minimal limitations in Mr. Renaud's ability to perform basic work activities. (Tr. 15). In light of the remand for reconsideration of the Step 2 analysis as it concerns Mr. Renaud's anxiety disorder, the findings related to these conditions need not be discussed further.

[2] The protocol for the ALJ review is well-established as a sequential five-step process. 20 CFR 404.1520(a)(4) and 404.920(a)(4), described in detail in *McDonald v. Sec'y of Health and Human Serv.*, 795 F.2d 1118, 1120 (1st Cir. 1986):
  First, the ALJ must determine whether the claimant is currently engaged in "substantial gainful activity." Here, Mr. Renaud had not worked since June 6, 2012, and the ALJ's finding that he was not engaged in "substantial gainful activity" (Tr. 14) is not challenged. (ECF 6).
  Second, the ALJ is to determine whether Mr. Renaud suffers a severe condition or impairment, defined as one that "significantly limits ... her physical or mental ability to perform basic work-related functions." This is where the ALJ parted ways with Mr. Renaud, finding that certain impairments were disabling but excluding anxiety disorder as one of them. (Tr. 14-15).
  Third, the ALJ is to examine the list of impairments in 20 CFR Part 404, Subpart P, Appendix A (20 CFR 416.920(d), 416.925 and 416.926). A person suffering an impairment on this list is automatically considered "disabled." This Step is not at issue here. (ECF 6).
  Fourth, assuming the ALJ has found a severe impairment not on the list, the ALJ is then to determine the claimant's "residual functional capacity" (RFC), which means the ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Essentially, since the claimant does not suffer from a listed impairment that would render him automatically disabled, the fourth step inquires whether he nonetheless is disabled because the particulars of his impairment are inconsistent with his ability to do his past relevant work or "any other work considering her residual functional capacity, age, education, and work experience." *McDonald v. Sec'y of Health and Human Serv., supra* at 1120. In this case, the ALJ's RFC finding in the face of his severe physical impairments cannot stand because it does not take into account a severe impairment due to anxiety.
  The fifth step, not reached here, relevant only if the claimant is found *not* able to perform his past relevant work, requires the Commissioner to demonstrate that there is *some* work available in the economy that he can perform. *Id.*

3

explain his failure to credit completely Mr. Renaud's description of the limitations his anxiety disorder placed upon him. These reasons, along with the substantial evidence that his anxiety disorder presents limitations both to his daily living and to his working ability, require reconsideration. The Step 4 RFC finding is integrally linked to the type and extent of the severe impairments found and thus cannot stand if the Step 2 determination is not sustained.[3]

---

[3] The Commissioner asserts before this Court that the finding that Mr. Renaud's anxiety disorder is not a severe impairment should be sustained because the evidence arguably falls short of demonstrating that the disorder lasted or could be expected to last 12 months. First, the Court agrees with Mr. Renaud that the ALJ's decision cannot be sustained on this basis because the ALJ did not predicate his failure to consider anxiety a severe disorder on a durational shortcoming. "[A]n agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.'" *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 397 (1974), partially quoting *Burlington Truck Lines,* 371 U.S. 156, 168-69 (1962); *Cummings v. Astrue,* 2010 WL 2076021 (D.Me. May 20, 2010) at *1, n. 2 (Rich, M.).

Second, the uncontroverted evidence shows that Mr. Renaud complained of anxiety, and was apparently on medication for anxiety, for a period of about 12 months with every indication that the panic attacks were continuing. Mr. Renaud was under treatment for anxiety and complained of panic attacks from at least July 24, 2012. (Tr. 57). The record is replete with treatment notes from providers concerning his continuing to experience panic attacks; in the words of medical expert Stephen Kaplan, M.D., the panic attacks are "well documented throughout the [record]." (Tr 42). The Commissioner relied on treatment notes from a moment in time in April 2013 when Mr. Renaud told his treating psychologist, Cara Fuchs, Ph.D., that he had not experienced "any recent panic attacks." He was not specific about what "recent" meant, and subsequent notes indicate that any lapse in attacks was relatively short-lived. Mr. Renaud saw Dr. Fuchs for both group and individual therapy just a few weeks later on May 6, 2013 (Tr. 973, 976), and continued in group therapy weekly at least into early June, as well as individual sessions. (Tr. 979, 988, 992). By June 11, 2013, a treatment note reflected complaints of weekly anxiety attacks with chest pain (Tr. 60), and Mr. Renaud testified at the hearing that by July 2013, he was experiencing these attacks 3-4 times per week. (Tr. 37). Finally, the finding by state agency expert Stacey Fiore, Psy.D., that Mr. Renaud's anxiety constituted a severe impairment necessarily implied she found it had lasted or would be expected to last at least 12 months. (Tr. 60).

## IV.

### Evidence of Anxiety

A mental state impairment requires assessment of the condition against four broad functional areas: (a) activities of daily living; (b) social functioning, (c) concentration, persistence or pace; and (d) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). There was no evidence in this case of decompensation. The evidence of anxiety disorder, manifested in panic attacks,[4] came from three sources: Mr. Renaud's treating physicians (including their treatment notes), the state agency consultants, and Mr. Renaud's testimony at the hearing.

Treating Physicians

Jeffrey Borkan, M.D. was Mr. Renaud's treating physician, having been his primary care physician since 2005. (Tr. 176, 501). He offered the opinion that Mr. Renaud had a severe panic and anxiety disorder that significantly limited his ability to engage in substantial gainful activity. (Tr. 514, 886, 512). Dr. Borkan appears to have first begun prescribing medication for Mr. Renaud's anxiety in early July 2012, with a 30-day trial of Buspar. (Tr. 299). By November, 2012, Mr. Renaud had been switched to Prozac. (Tr. 204, 220). Even though the Prozac had increased from 20 mg daily to 40 mg (Tr. 506, 513), Dr. Borkan concluded in January 2013 that Mr. Renaud's "[d]aily panic attacks will make work difficult to impossible." (Tr. 512-13). While there was some improvement in February 2013 (Tr. 516, 880), by April 2013, Mr. Renaud was again reporting daily panic attacks (sometimes twice daily), lasting for about an hour each time. (Tr. 968). By July 2013, Dr. Borkan had added Paxil to the Prozac Mr. Renaud was already taking, as well as Klonopin at night, because the anxiety had outstripped the ability of Prozac to control it. (Tr. 228, 995).

---

[4] Dr. Borkan, on April 1, 2013, diagnosed Mr. Renaud with Somatization Disorder – physical manifestations of chest pain psychosomatic in nature and origin. (Tr. 619).

5

A second treating physician, Priya Kholi, M.D., reported on June 11, 2013, that Mr. Renaud's "significant depression/anxiety," combined with the other impairments found severe by the ALJ, precluded him from working full time. She noted that significant fatigue of "moderate severity" resulted from anxiety. (Tr. 792). She had treated him for more than a year by that time. (Tr. 789).

A third professional, psychologist Cara Fuchs, was treating Mr. Renaud for anxiety[5] in both individual and group sessions from November 2012 at least into June 2013. (Tr. 605, 868, 980, 988). She was specifically helping him to leave his house alone, and from time to time she reported some progress. For example, her notes of 2/11/13 indicate he was able to go to the supermarket on one occasion by himself. (Tr. 516). On the other hand, the "nearly" daily panic attacks reported in November by Dr. Surti had increased to "daily" reported by Dr. Borkan five months later. (Tr. 633).

Consulting Physicians[6]

Dr. Ghulam Mustafa Surti performed a psychiatric consultative examination in November 2012. (Tr. 505-09). It showed that while Mr. Renaud's memory and concentration tested normal in a one-on-one setting, he had an "anxious effect and a nervous mood." (Tr. 507). Dr. Surti reviewed Mr. Renaud's past medical history, including his past psychiatric history, and

---

[5] In May and June of 2013, Dr. Fuchs noted that the scoring of Mr. Renaud's reported thoughts and behavior warranted a diagnosis of major depression as well. (Tr. 980, 993).

[6] Medical expert Stephen Kaplan, M.D., provided no direct evidence on the issue of anxiety, except to note that the panic disorder is "well documented" throughout the record. (Tr. 42). He also offered his expert opinion that the chest pain, which was atypical, could be due to anxiety. (Tr. 41). Mr. Renaud takes issue with the ALJ's failure to address this evidence, but even if that constituted a failure to comply with the mandate to "evaluate very medical opinion .... receive[d]," 20 C.F.R. §303.`417(c), the Plaintiff would gain nothing by it: the ALJ never rejected that Mr. Renaud suffers from a panic disorder; the operative question is how severe it was and "well documented" is not inconsistent with the ALJ's finding of non-severity.

assigned a GAF score of 45-50.[7] Dr. Surti diagnosed him as suffering from "severe panic attacks, caused by a panic disorder without agoraphobia." Mr. Renaud's nearly-daily attacks, as early as November 2012, contributed to his opinion that "[b]ased on his present level of symptoms at functioning, [Mr. Renaud] is unable to hold a job." (Tr. 507).[8]

State agency psychologist Stacey Fiore, Psy.D. reviewed the entire file as a consulting expert on November 19, 2012. She found a severe anxiety disorder, with severe panic attacks, resulting in moderate limitations both in maintaining social functioning and the ability to maintain a workday. (Tr. 60). Those limitations rendered him unable to tolerate social demands beyond minimal ones. (Tr. 63-64). She further concluded Mr. Renaud was "moderately" limited in his ability to interact with the general public, could tolerate only simple changes in routine, and could make or carry out only simple plans. *Id.*

Medical Records

The record is replete with references to Memorial Hospital visits, most often to emergency rooms, sometimes by ambulance, when Mr. Renaud complained of chest pain that was attributed to anxiety because it was not of cardiac origin.[9] *E.g.*, trip to ER on 5/20/12 and

---

[7] A GAF score of 41 to 50 corresponds to any serious impairment in social, occupational or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000).

[8] The ALJ gave Dr. Surti's opinion little weight because it "appears based on the claimant's subjective complaints and not his evaluation that showed good recall, memory, concentration and thought." (Tr. 19). First, it is not surprising that an opinion about a mental health disability would be based largely on subjective complaints. Second, there was no expert testimony offered that panic attacks are inconsistent with "good recall, memory, concentration and thought." To the extent that ALJ relied on his own lay understanding to reach that conclusion, such was error. *Alcantara v Astrue*, 257 Fed.Appx. 333, 334 (1st Cir. 2007) (*per curiam*).

[9] For example, tests and examinations during the overnight stay of July 19-20, 2012, when Mr. Renaud complained of "chest tightness 'all the time'", revealed a regular heart rate and rhythm, no abnormalities, a sinus rhythm on ECG with no acute changes, no arrhythmia and no ischemia. (Tr. 269). Mr. Renaud also visited Miriam Hospital in October of 2012, complaining of chest pain. (Tr. 530).

6/26/12, admissions on 5/23/12, 6/17/12, 7/29/12, 9/5/12, 9/30/12, 10/17/12, 3/22/13 (Tr. 236, 245, 265, 266, 563, 572, 576, 597). Consulting physician Surti explained that while the panic attacks were occurring several times per week as of November 2012 (nearly daily according to his notes), every week or two there would be one of such intensity that Mr. Renaud would think it might be a heart attack and go to the ER. (Tr. 505).

Mr. Renaud's Testimony

Mr. Renaud testified that the health problems that led to the disability application began coincident in time with his triple bypass surgery in 2011. At the time he was working at an insurance call center, talking with insureds through a headset, and working in a room with six other employees. (Tr. 45). While he returned to work after the operation, the surgery was followed within a year by anxiety attacks, an emergency visit to the hospital, and the placement of a cardiac stent. (Tr. 32). The anxiety attacks that followed on the heels of the stents were feared by him to be heart attacks, sending him to the hospital. (Tr. 36). Ultimately, the anxiety attacks became more frequent, and precluded him from working altogether. (Tr. 37). Without medication, the attacks were as frequent as 2-3 times per day; with medication, and some therapy strategies, they reduced to 3-4 times per week. *Id.* The call center job no longer existed, he testified, but he would not be able to perform it any longer because of his anxiety. (Tr. 32, 34-35).[10]

---

[10] Much of Mr. Renaud's testimony concerned his physical health ailments and restrictions caused by them. For example, he testified he can do some household tasks, such as washing dishes and vacuuming, but only with rest periods. (Tr. 35). He is physically impaired by neuropathy and edema from climbing stairs and had to move to a first floor as a result. (Tr. 36). Because the ALJ found he suffered from severe physical impairments, and because the matter must be remanded in any event for reconsideration of the Step 2 determination, a full recounting of the evidence of physical impairments is not necessary.

Mr. Renaud testified he had difficulty venturing from his house, particularly alone. (Tr. 37). He had suffered anxiety attacks while driving, and at the market, and ultimately stopped trying to do these activities alone. (Tr. 38). Attacks are fatiguing, he testified, lasting 1-2 hours, and leaving him feeling "worn out." *Id.*

The anxiety disorder he suffers from, exacerbated by depression, has severely limited his ability to socialize and to be out in public. He used to play pool weekly, but could no longer tolerate the crowds. (Tr. 38). His socializing had become limited to visits at his home with his sister and partner, who both live with him, and his mother. (Tr. 38).

## V.

## Standard of Review

A district court's role in reviewing the Commissioner's decision is limited. Although questions of law are reviewed *de novo*, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). The term "substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The determination of substantiality must be made upon an evaluation of the record as a whole. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) ("'We must uphold the Secretary's findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" (quoting *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In reviewing the record, the Court must avoid reinterpreting the evidence or otherwise substituting its own judgment for that of the Secretary. *See Colon v. Sec'y of Health and Human Servs.*, 877 F.2d 148, 153 (1st

Cir. 1989). The resolution of conflicts in the evidence is for the Commissioner, not the courts. *Rodriguez*, 647 F.2d at 222 (citing *Richardson*, 402 U.S. at 399).

The Court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (*per curiam*), *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Seavey v. Barnhart*, 276 F.3d 1, 11 (1st Cir. 2001) (citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985)).

## V.

### ALJ Decision

Pertinent to this discussion, Mr. Renaud challenges four aspects of the ALJ's Step 2 determination that his anxiety disorder was not severe, all of which contend that the conclusion was not supported by substantial evidence. In essence, Mr. Renaud complains of the rejection of the opinions of treating physician Dr. Borkan, consulting physician Dr. Surti, state agency reviewing psychologist Dr. Fiore, and medical expert Dr. Kaplan.

Of the six experts contributing to this record,[11] four expressed opinions relative to the severity of Mr. Renaud's anxiety and its impact on his ability to work: Dr. Borkan (his primary care physician), Dr. Kholi (his cardiologist) Dr. Fuchs (his psychologist), and Dr. Surti, a consultative examiner. The ALJ gave each of these opinions little or limited weight. (TR. 19-20). Furthermore, the ALJ failed to find Mr. Renaud completely credible with respect to his

---

[11] Vocational expert Thomas Bennett, M.D. submitted an opinion at the initial consideration stage, before Mr. Renaud put forth his anxiety disorder. (TR. 48-54, dated July 9, 2012).

description of his limitations without explaining why or to what extent he discounted Mr. Renaud's testimony.

A treating physician's opinion is to be given controlling weight unless it is not supported by substantial evidence and not inconsistent with the record as a whole. *Ormon v. Astrue*, 497 Fed.Appx. 81, 84 (1st Cir. 2012). Here, the ALJ gave little weight to Dr. Borkan's conclusion that Mr. Renaud's panic attacks would make work difficult to impossible, because, he said, it was "not consistent with the record as a whole." (Tr. 19). The ALJ did not explain how the record was inconsistent with Dr. Borkan's opinion and inconsistencies alone, even if existing, are not *per se* sufficient to reject a treating source's opinion. *Id.* (treating source was aware of inconsistent test results and maintained opinion nonetheless, and inconsistent consultative physician's opinion was not well-explained). Dr. Borkan's opinion was consistent with that of treating physician Dr. Kholi, treating psychologist Dr. Fuchs and consulting physician Dr. Surti. Even Dr. Fiore, who believed Mr. Renaud only moderately impaired, considered his anxiety disorder "severe." (Tr. 60).[12] Where no other physician contradicts the treating physician's opinion, "clear and convincing" reasons are required to reject it. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Certainly the panic attacks Mr. Renaud testified to and their interference with his going out alone were, if found credible, serious and frequent enough to be totally consistent with Dr. Borkan's opinion.

The ALJ gave little weight to Dr. Surti's opinion that Mr. Renaud's panic attacks were extreme enough to render him unable to hold a job because he found it based on subjective

---

[12] Dr. Kaplan, a vocational expert, offered an opinion about the claimant's ability to work that did not take account of his panic disorder. (Tr. 42).

11

complaints and not the evaluation showing "good recall, memory, concentration and thought."[13] As a consultative physician, however, Dr. Surti was required to render an opinion based on all the evidence he reviewed, which included the subjective complaints. Indeed, when rendering an opinion on the severity of a mental health condition, subjective complaints are frequently the most significant information, and Social Security regulations recognize the legitimacy of subjective complaints to establish the severity of symptoms:

> The Administration's own regulation states that "an individual's statements about the intensity and persistence of pain *or other symptoms or about the effect the symptoms have on his or her ability to work* may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96–7p(4).

*Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (emphasis supplied).

In addition, Dr. Surti had assessed Mr. Renaud with a GAF score of 45, which indicates "serious symptoms" or "serious impairment" in social, occupational, or school functioning. *Winning v. Commissioner of Social Security*, 661 F. Supp.2d 807, 812 n.5 (N.D.Ohio 2009), citing *DSM-IV-TR*, 32-24. Dr. Surti made clinical observations of his own that were consistent with his opinion, noting that Mr. Renaud had an "anxious effect and a nervous mood." (Tr. 505-09). *Accord, Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1199 (9th Cir. 2008) (medical expert relied on own observations of "distraught, nervous, shaky, and edgy [affect]" as well as subjective complaints). Finally, to the extent that the ALJ implied that Mr. Renaud's complaints were inconsistent with "good recall, memory, concentration and thought," that must have been predicated upon his own lay judgment as there was no expert evidence to that effect, and that is impermissible. *Alcantara v Astrue*, 257 Fed.Appx. 333 (1st Cir. 2007) (per curiam).

---

[13] Rejection of an expert's opinion because it was based on a claimant's subjective complaints is justified only if the credibility of the self-reports have been "properly discounted as incredible." *Allen v. Commissioner of Social Security*, 498 Fed.Appx. 696, 696 (9th Cir. 2012).

## Evaluation of Mr. Renaud's Credibility[14]

Twice in his testimony, Mr. Renaud mentioned how much he enjoyed working. He described the call-in center as an enjoyable job, and he testified he would "like to go back to work" if he could "be healed from what [he was] going through right now." (Tr. 34, 40). Against the backdrop of a claimant whose work history was consistent with his testimony that he preferred working to not working, the ALJ found his assertions largely credible: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; ..." (Tr. 18).

The ALJ discredited to an explained extent, however, Mr. Renaud's description of the severity of his anxiety attacks and the limitations they caused: "however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not *entirely* credible for the reasons explained in this decision." (Tr. 18) (emphasis supplied). Yet the remainder of the decision discloses no reasons explaining, much less justifying, that rejection, as it relates to panic attacks; the remainder of the decision concerns only the severity of his medical conditions.

Where a claimant's allegations are rejected, the ALJ "must articulate specific and adequate reasons for doing so." *Auger v. Astrue*, No. CA 09–622S, 2011 WL 846864, at *9 (D.R.I. Feb. 3, 2011). The rejection must be explicit and supported by a good reason. *Wildman*

---

[14] Although Mr. Renaud's Motion to Reverse does not directly challenge the ALJ's rejection of his credibility, the credibility of Mr. Renaud's description of the limitations his panic attacks cause is directly related to the ALJ's conclusion that the "medically determinable mental impairment of anxiety disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." (Tr. 15).

13

*v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).[15] Nothing in the ALJ's discussion of Mr. Renaud's credibility addressed his description of or testimony about limitations caused by anxiety panic attacks. Significantly, Mr. Renaud's treating physician obviously believed the extent of the attacks and symptoms described, as he not only prescribed medication but doubled the Prozac and added Plaxil as well. *Accord, Adaire v Colvin, supra* at 686 (failure of treating therapists to witness panic attacks did not undercut credibility of claimant's description, as therapists "believed him, and the administrative law judge had no basis for disbelieving them.").

If the ALJ believed Mr. Renaud was exaggerating the debilitating extent of his panic attacks, there was no medical opinion testimony upon which to base that conclusion. *Ormon v. Astrue, supra* at 86 (ALJ belief that claimant malingering invalid because of the absence of medical opinion to that effect). It is not within the ALJ's lay qualifications to reach that opinion without such testimony. *Id.*

---

[15] Apart from the statement quoted above, the ALJ's comments on Mr. Renaud's credibility were as follows:

> The claimant's allegations are found to be not fully credible and treatment notes in the record do not sustain the claimant's allegations of a disabling condition. The claimant's treatment notes showed a history of cardiac treatment; however, his condition was reported as stable and during recent visits for cheat pain, it was determined that his symptoms were not of cardiac origin (Exhibits 15F, 16F, 18F, 33F). With regard to his diabetes, his treatment notes showed he was doing well on his current insulin regimen and exams showed only some decreased sensation in his feet with no effect on his gait (Exhibits 19F, 33F). The claimant testified that he elevated his legs five to six hours a day due to edema; however, there was no evidence that he reported this to his treatment providers and his treatment notes showed little evidence of edema (Exhibit 33F). The claimant also testified that he was able to perform his activities of daily living with little difficulty and an impartial medical expert testified that the claimant was able to perform work at the sedentary exertional level. The undersigned acknowledges that the claimant does experience some limitations but not to the extent alleged.

(Tr. 20).

The ALJ's Step 2 determination that Mr. Renaud's anxiety disorder was not severe depended directly on Mr. Renaud's assertion of limitations that condition caused. "The claimant's medically determinable mental impairment of anxiety disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." (Tr. 15). But there is a disconnect between the symptoms Mr. Renaud testified to and the symptoms the ALJ described. Mr. Renaud's symptoms are described in incomplete ways that minimized their impact.[16] It is conceivable that disconnect was due to the ALJ finding Mr. Renaud's testimony "not entirely" credible. But there is no explanation to that effect. (Tr. 15-16).

It is also conceivable that the disconnect resulted from the passage of time. For example, the ALJ found that Mr. Renaud was able to shop, drive a car and go out alone. (Tr. 15). That

---

[16] With respect to the first functional area, activities of daily living, the ALJ noted that Mr. Renaud could "perform self-care" and do some household tasks, that he "could shop for groceries and household items," "that he was able to drive a car" and do financial tasks. He failed, however, to note at all Mr. Renaud's critical testimony that very soon after filing his initial claim, his anxiety had worsened to the extent that he could not shop or do any other errands or drive a car unaccompanied. He had tried to go shopping alone and to drive alone, and it appeared that on each of the several occasions he tried to do so, he had an anxiety attack either driving or at the market. (Tr. 37-38). After a few unsuccessful attempts, he stopped trying. *Id.* In August of 2012, Mr. Renaud indicated on a questionnaire that he could drive alone to a doctor's appointment (Tr. 210), but by the time of the hearing, he testified that on occasions when he drove, his mother "travels around with [him]." (Tr. 36). *See Van Winkle v. Barnhart*,

With respect to the second functional area, social functioning, the ALJ noted mild limitation but reported that he was "always able to converse with others and ... his sister and mother visit his home. He also reported that he regularly went to doctor's appointments but he needed to be accompanied at times." The ALJ failed to appreciate that Mr. Renaud drew a clear distinction between social interaction he could engage in *before* the onset of the panic attacks and what he was able to do after. He testified that after stents were placed, he tried to return to work but could not due to the frequency (2-3 times daily at that time) and duration (1-2 hours) of his panic attacks. He clearly testified he was no longer able to tolerate the conditions he once had worked under. (Tr. 32, 34-35). In addition, his sister lives with him; if he has a second sister who visits, that was not made clear. (Tr. 38).

With respect to the third and fourth functional areas (concentration, persistence or pace, and episodes of decompensation), the ALJ found mild limitation as to the third and no evidence of the fourth.

was the description of Mr. Renaud's capabilities as of August 12, 2012 ("goes out alone, handles finances, drives, shops with help, socializes, ... does well with stress on meds"). (Tr. 59).

By the time of the hearing, the testimony clearly revealed a man whose anxiety had progressed to the point where it relegated him to a sheltered existence where he rarely leaves his home; he testified about "when I *used to* go out." (Tr. 38) (emphasis supplied). On the occasions when he leaves home, he is accompanied, usually by his mother. The record does not indicate anywhere he goes, other than to medical appointments, and, accompanied by his mother, food shopping. He seemed to have no visitors except for his mother. (Tr. 38). The inability to leave his house unaccompanied, and the inability to work in an environment he loved working in but that has seven employees, and the inability to tolerate crowds, are severe limitations to employment. *E.g., Winters v. Barnhart,* 153 Fed.Appx. 846, (3rd Cir. 2005) (vocational expert's failure to take into account claimant's inability to leave home freely due to agoraphobia undercut utility of his opinion). *Cf., Kalmbach v. Commissioner of Social Security,* 409 Fed.Appx. 852, 864 (6th Cir. 2011) (claimant's ability to do activities outside her house for only 30 minutes per day because of symptoms of fibromyalgia was not sufficient to enable her to work outside her home).

Significantly, Mr. Renaud's report of symptoms and the limitations on working caused by his anxiety disorder was consistent with the medical testimony offered by both treating and consulting physicians and there was no medical evidence suggesting that the reported symptoms – specifically his daily panic attacks that made it difficult and frequently outright impossible to go out alone -- were fabricated or exaggerated.

## Conclusion

"[I]t is well to bear in mind that '[t]he Social Security Act is a remedial statute which must be 'liberally applied.'" *Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 531 (6th Cir. 1992) (quoting *Marcus v. Califano*, 615 F.2d 23, 29 (2nd Cir. 1979)). "[T]he Social Security Act should be construed liberally in order to further its remedial purposes." *Slessinger v. Sec'y of Health & Human Servs.*, 835 F.2d 937, 943 (1st Cir. 1987) (citing *Cunningham v. Harris*, 658 F.2d 239, 243 (4th Cir. 1981). The *Cunningham* court explained that

> [W]e are also bound to interpret the Social Security Act as a program of social insurance on which people can rely to provide for themselves and their dependents. Claimants are the beneficiaries of insured wage earners, not recipients of government gratuities, and are entitled to a broad construction of the Act. In practical terms, when a Social Security Act provision can be reasonably interpreted in favor of one seeking benefits, it should be so construed.

658 F.2d at 243 (citations omitted). *See also Smirga v. Sec'y of Health & Human Servs.*, 607 F. Supp. 680, 685 (W.D. Pa. 1985) ("Where evidence has been presented and the case is close as it involves the application of the Social Security Act, the balance should be cast in favor of, rather than against, coverage in order to fulfill the statute's broad and beneficent [sic] objects.").

The ALJ's near-total rejection of the consistent opinions of both treating and consultative professionals in spite of substantial evidence in support of them, combined with his unexplained rejection of Mr.Renaud's testimony, renders his decision inadequately supported. The Step 2 finding that Mr. Renaud's anxiety disorder was not a severe impairment must be reconsidered or, at the least, more fully explained.

The matter is therefore remanded for reconsideration.

SO ORDERED,

*[signature: John McConnell]*

John J. McConnell, Jr.
United States District Judge

July 1, 2015